IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KELLY ANGELL, individually and as parent and natural guardian of her children, K.R.M., K.M.A., I.C.M. C.C.A, and Sade Angell, and DERONE LEWIS, individually. | CIVIL ACTION NO.  2:23-cv-1268 |
| Plaintiffs | JURY TRIAL DEMANDED |
| v. | |
| CITY of PITTSBURGH, STEPHEN MESCAN, JAMES MONKELIS, JOHN DOE #1, JOHN DOE # 2, JOHN DOES # 3-10, JOHN DOES 11-20, | |

**COMPLAINT IN CIVIL ACTION**

AND NOW COME the Plaintiffs, Kelly Angell, individually and as parent and natural guardian of her children K.R.M., K.M.A., I.C.M. C.C.A, and Sade Angell, and Derone Lewis, individually, by and through their attorney Margaret S. Coleman, and the law firm of O'Brien, Coleman & Wright LLC, and file the within Complaint in Civil Action as follows:

**I)     INTRODUCTION**

1)     This Complaint alleges that City of Pittsburgh and Borough of Monroeville police officers violated the civil rights of Plaintiff Kelly Angell and her family by unlawfully using paramilitary force to break into their house, detain them, destroy their belongings, and contaminate their home with tear gas.

**II)     JURISDICTION**

2)     This action is brought pursuant to the Civil Rights Act of 1873, as amended, 42 U.S.C. §1983. This Court has jurisdiction over Plaintiffs' claims against the above-referenced Defendants pursuant to 28 U.S.C. §1343 and/or 28 U.S.C. §1331.

**III)     PARTIES**

3)     Plaintiff Kelly Angell is an adult resident of the City of Pittsburgh, County of Allegheny, Commonwealth of Pennsylvania. Angell brings this lawsuit individually, on behalf of her minor children K.R.M., K.M.A., I.C.M. and C.C.A., as their parent, and on behalf of her disabled adult child, Sade Angell, as her guardian.

4)     Plaintiff Derone Lewis is an adult resident of the City of Pittsburgh, County of Allegheny, Commonwealth of Pennsylvania.

5)     Defendant Stephen Mescan is a City of Pittsburgh police officer who was, at all times relevant, responsible for approving, planning and overseeing the City's Special Weapons and Tactics (SWAT) team deployments. This Defendant is responsible for ensuring that City of Pittsburgh SWAT officers are properly trained, supervised, and disciplined. Upon information and belief, this Defendant is responsible for approving deployment of the SWAT team and ensuring that any SWAT deployments are planned appropriately and comply with Constitutional standards. With respect to the events alleged herein, this Defendant was acting under the color of state law and in accordance with the customs, practices and/or policies of the City of Pittsburgh. This Defendant is sued in his individual capacity.

6)     Defendant James Monkelis is a detective employed by the Borough of Monroeville Police Department. With respect to the events alleged herein, this Defendant was acting under the color of state law and in accordance with the customs, practices and/or policies of the Borough of Monroeville.

7)     Defendant John Doe # 1 was the tactical commander of the SWAT team with respect to the incidents occurring at 1101 Paulson Avenue on January 15, 2023. With respect to

the events alleged herein, this Defendant was acting under the color of state law and in accordance with the customs, practices and/or policies of the City of Pittsburgh.

8) Defendant John Doe # 2 was a member of the City of Pittsburgh SWAT team who identified himself to Plaintiffs as a "negotiator." With respect to the events alleged herein, this Defendant was acting under the color of state law and in accordance with the customs, practices and/or policies of the City of Pittsburgh.

9) Defendants John Doe ## 3-10 are adult individuals employed as police officers by the City of Pittsburgh. Some or all of these Defendants were members of the City of Pittsburgh SWAT team. These Defendants were present during and participated in the raid on 1101 Paulson Ave. With respect to the events alleged herein, these Defendants were acting under the color of state law and in accordance with the customs, practices and/or policies of the City of Pittsburgh.

10) Defendants John Doe ## 11-20 are adult individuals employed as police officers by the Borough of Monroeville. These Defendants were present during and participated in the raid on 1101 Paulson Ave. With respect to the events alleged herein, these Defendants were acting under the color of state law and in accordance with the customs, practices and/or policies of the Borough of Monroeville.

**IV) FACTS**

11) On Sunday January 22, 2023, Plaintiffs Kelly Angell, Derone Lewis and Ms. Angell's five daughters, Sade Angell (24), K.M.A. (16), K.R.M. (16), I.C.M. (13) and C.C.A. (7) (collectively "the family") were inside their home at 1101 Paulson Avenue in Pittsburgh, Pennsylvania.

12) At approximately 10:30 am, the family's neighbor witnessed an armored SWAT vehicle, flanked by 15-20 officers dressed in tactical gear and carrying semi-automatic rifles ("SWAT officers"), drive up Paulson Avenue and stop in front of the family's home.

13) Two hours earlier, at 8:30 am, Defendant Monkelis had obtained a search warrant for 1101 Paulson Avenue. The "items to be searched for and seized" included a cellular phone and items which had been used in connection with a non-fatal shooting the night before in Monroeville.

14) The warrant incorrectly listed Daronte Anthony Brown as the "owner, occupant or possessor" of the premises.

15) In a sworn affidavit supporting the warrant, Monkelis represented that because of the "extreme danger" that Brown posed to the community, "the Monroeville Police Department utilized active cellular phone emergency pings. BROWN's phone remains active at this time at the residence to be searched." This was the only statement in the affidavit of probable cause which linked Brown to the house at 1101 Paulson Ave.

16) On information and belief, the phrase "active cellular emergency pings" referenced cell phone triangulation, a method of locating a cellphone based on its distance from nearby cell towers. This technology is widely known to be insufficiently accurate or reliable to establish that a phone is present within a particular building.

17) On information and belief, after receiving the signed warrant, Monkelis requested assistance from the City of Pittsburgh SWAT team to execute the search warrant, knowing that the SWAT team would employ paramilitary tactics such as those described herein.

18) On information and belief, Monkelis provided a copy of the warrant and sworn affidavit to Defendants Mescan and Doe # 1.

19) On information and belief, Mescan approved the use of the SWAT team and appointed Doe #1 as Tactical Commander for the purposes of planning and executing the raid on 1101 Paulson Ave.

20) On information and belief Mescan approved Doe # 1's plan, including all of the tactics described herein.

21) As the armored vehicle and 20 or more SWAT officers approached the house, Ms. Angell's daughter I.C.M. was sitting by a window. I.C.M.'s sister K.R.M. saw a green dot from a laser on I.C.M.'s forehead. I.C.M. and K.R.M. then looked out the window and saw numerous men in tactical military gear pointing rifles at their house. They both yelled to their mother that men outside were pointing guns at them.

22) Ms. Angell immediately ran down the stairs to her front door.  As Ms. Angell descended the stairs, she heard "bombs" going off and glass breaking.

23) On information and belief, the "bombs" that Ms. Angell heard were flash bang grenades. These are explosives which cause a bright flash of light and an extremely loud noise. They are designed to cause temporary blindness, loss of hearing, disorientation and panic.  The City of Pittsburgh SWAT team routinely uses these devices to frighten and incapacitate people when breaking into their homes.

24) Defendants used high powered rifles to shoot these flash bang grenades through the family's windows, including into rooms which were occupied by Ms. Angell's children.

25) As Ms. Angell reached the front door and opened it, numerous SWAT officers streamed into her home. Simultaneously, more SWAT officers broke through her back door and basement door and began flooding her home from multiple directions.

26) SWAT officers physically removed Ms. Angell, K.M.A. and I.C.M. from the house.

27) The officers were pointing guns, yelling the name DaRonte Brown and shouting that they had the house surrounded.

28) Mr. Lewis was the only man in the house. He presented himself to the SWAT officers, assuming that they would quickly figure out that he was not DaRonte Brown and go away.

29) The SWAT officers removed Mr. Lewis from the house, handcuffed him, punched him repeatedly and pulled his hair back to look at his face.

30) Mr. Lewis is 6'3", weighs 250lbs and has dark skin. DaRonte Brown is short, thin and light skinned. The officers knew immediately that Mr. Lewis was not Brown. Nevertheless, the officers kept him in handcuffs and separated him from the rest of the family for at least an hour and a half.

31) Sade, who is severely autistic and non-verbal, had begun screaming uncontrollably when the SWAT officers shot a flash bang grenade through a third-floor window into her bedroom.

32) Seven-year-old C.C.A. did not understand what was happening and hid behind a door.

33) Sixteen-year-old K.R.M. did not want to leave her sisters alone in the house, so she stayed with them, but laid down on the floor where the officers would be able to see her.

34) Eventually K.R.M. was able to persuade C.C.A. to come out from behind the door and walk down the steps. However, Sade would not respond to K.R.M.'s attempts to calm her and continued to scream.

35) As K.R.M. and C.C.A. came down the steps, the SWAT officers removed them from the house.

36) K.R.M. tried to record the SWAT Defendants' actions with Ms. Angell's cell phone. Before she was able to record anything, a John Doe officer confiscated Ms. Angell's phone and searched it. This officer left the scene with Ms. Angell's phone and did not return it to her until later that evening.

37) Both Ms. Angell and Mr. Lewis began frantically telling Defendants that because Sade is autistic, she would not respond to them if they yelled at her. They were afraid that Sade would be injured or killed for failing to follow the officers' commands.

38) The SWAT officers ignored Ms. Angell and Mr. Lewis and continued to storm through the house shouting and breaking things.

39) When Sade did not exit the house and continued to scream, Ms. Angell told the officers that she was going to go get Sade and began to walk toward the house. Officers stopped her and attempted to handcuff her.

40) Shortly after, an officer brought Sade out of the house. She was crying and her nose was bleeding.

41) The family was detained outside of their home for approximately three and a half hours.

42) On January 15, 2023, the high temperature in Pittsburgh was 36 degrees and the low temperature was 15 degrees. Ms. Angell and her family were dressed for spending a Sunday afternoon at home and were not dressed appropriately for cold weather. None of them were wearing coats or shoes. Ms. Angell and Mr. Lewis were both wearing shorts.

43) Although the children were detained inside of either a SWAT vehicle or an ambulance for most of the raid, Ms. Angell and Mr. Lewis remained outside.

44) The officers did not offer them any covering or means of keeping warm. A neighbor boy offered them "Crocs" so they would not have to stand on the cold ground in bare feet.

45) While Defendants detained the family outside of their home, SWAT officers spent approximately three hours thoroughly searching the approximately 1,300 square foot home and damaging the family's property.

46) Defendants caused excessive and unnecessary damage to the home. For example, an officer used a door which had been ripped from its hinges to break a window after the entire family had been removed from the home.

47) A SWAT officer who identified himself as a "negotiator" (John Doe # 2) showed Ms. Angell a picture of Brown. Ms. Angell told the officer that she had never seen the man before and he was not in her home.

48) Doe # 2 falsely told Ms. Angell that Defendants knew that her daughters were hiding Brown in the house and that an iPhone ping had located Brown in a specific room inside her home.

49) Defendant Monkelis also showed Ms. Angell a photograph of Brown and told her that Defendants knew that Brown was in her house because they had "eyes on" him inside one of the bedrooms.

50) Defendant Monkelis and the Doe # 2 interrogated Ms. Angell's daughters outside of her presence. These Defendants falsely told the girls that they had seen Brown in the house and that they knew the girls were hiding him.

51) Doe #2 told the family repeatedly that if they did not tell him where the suspect was, the SWAT officers would "gas" their home. After the family stated repeatedly that Brown was not in the house and they did not know where he was, Doe #2 told them that this was their "last chance" and that if they did not produce Brown immediately the SWAT team was going to "fuck up [their] house even more."

52) The SWAT officers then set off multiple chemical grenades inside the Angell family's home.

53) On information and belief, these grenades contained CS gas, a chemical agent commonly referred to "tear gas."

54) Exposure to CS gas incapacitates a subject by causing a burning sensation and tearing of the eyes, burning irritation of the mucous membranes of the nose, mouth and throat, profuse coughing, nasal mucus discharge, disorientation, and difficulty breathing.

55) When used indoors, CS gas leaves a residue which contaminates the entire home including carpets and furniture. The residue is extremely difficult to clean, can continue to affect residents for months and may cause long-term respiratory damage.

56) Despite contaminating the entire house with CS gas, Defendants did not locate Brown inside.

57) When Ms. Angell and Mr. Lewis were finally permitted to reenter the home, they encountered numerous police officers standing on their front porch laughing and joking.

58) Ms. Angell became irate.

59) A Sergeant from the Pittsburgh Bureau of Police was called to the scene. He acknowledged that the SWAT team should not have broken into the house. He stated that the SWAT team decided to break into the house based on a cell phone ping "in the vicinity."

60) Defendant Monkelis told Ms. Angell that someone would come to the house to fix the doors and windows the following day.

61) The Red Cross obtained a hotel room for Ms. Angell's children, but Ms. Angell and Mr. Lewis slept in the house that night to protect the home and the family's belongings, which could no longer be secured.

62) No one from the City of Pittsburgh or Monroeville came to fix the family's doors or windows.

63) When Ms. Angell called the Monroeville Police Department to ask about repairing the damage to her home, she was referred to the City of Pittsburgh.

64) The City of Pittsburgh Law Department stated that the City would consider repairing the damage only after multiple estimates had been submitted.

65) The family covered some of the windows with cardboard.

66) To date, the windows on the third floor of the house, where Sade, K.R.M. and K.M.A sleep, have still not been repaired.

67) The family has not been able to remove all of the broken glass from their carpets.

68) The family has not been able to clean the CS gas residue from their carpets, floors, furniture and walls.

69) The children's clothes were so contaminated with CS gas that they could not be worn and had to be thrown away.

70) The family still experiences physical effects of the CS gas residue when in their home.

### V)     CLAIMS

**Count I**
*Fourth Amendment*
<u>Invalid Warrant/Unlawful Entry</u>

71) The foregoing paragraphs are incorporated herein by reference.

72) Defendant Monkelis knew, based on his training and experience, that cell phone triangulation technology is insufficiently accurate or reliable to provide probable cause to believe that a phone is present within a particular dwelling.

73) This fact was material to the justification for probable cause and should have been included in Monkelis' affidavit.

74) Defendant Monkelis falsely stated in his affidavit of probable cause that Brown's phone was "active at 1101 Paulson Ave." despite knowing that cell phone triangulation technology is insufficiently reliable to provide probable cause to believe that a phone is present within a particular dwelling.

75) Monkelis' omissions and/or false statements were made knowingly, intentionally and/or with reckless disregard in violation of the Fourth Amendment of the United States Constitution.

76) All Defendants were aware when they took the actions described herein that the search warrant authorizing entry into 1101 Paulson Ave. was based on Monkelis' material omissions and/or misrepresentations and was therefore invalid.

77) At all times relevant, Defendants' unlawful entry into the plaintiff's home was the proximate cause of the harm suffered by the plaintiffs

**Count II**
*Fourth Amendment*
Excessive Force

78) The foregoing paragraphs are incorporated herein by reference.

79) The use of paramilitary force, including the specific tactics described herein, to execute the search warrant on Plaintiffs' home was unreasonable, excessive and unwarranted by the underlying circumstances, in violation of the Fourth Amendment to the United States Constitution.

80) Defendants were aware, when they entered and/or authorized entry into 1101 Paulson Avenue, that there was a substantial and unjustified risk that they were subjecting innocent individuals, including children and other vulnerable persons, to the overwhelming and terrorizing show of governmental force inherent in a SWAT raid.

81) On information and belief, Defendants did not make any effort to determine whether children or other vulnerable persons were present before utilizing paramilitary force to break into 1101 Paulson Avenue.

82) Defendants did not adjust the level of force or the tactics used to account for the possibility that children or other vulnerable persons would be present at 1101 Paulson Avenue.

**Count III**
*Fourth Amendment*
Unlawful Detention

83) The foregoing paragraphs are incorporated herein by reference.

84) Defendants had no probable cause or reasonable suspicion to believe that any Plaintiff had committed a crime.

85) Defendants' detention of Plaintiffs outside of their home for over three hours constituted an unreasonable seizure which violated their Fourth Amendment rights.

86) Defendants' detention and handcuffing of Plaintiff Derone Lewis for over an hour and a half after they knew that he was not the individual for whom they had an arrest warrant constituted and unreasonable seizure which violated his Fourth Amendment rights.

### Count IV
*Fourth Amendment*
Failure to Knock and Announce

87) The foregoing paragraphs are incorporated herein by reference.

88) Defendants did not knock and/or announce their presence before breaking into 1101 Paulson Ave in violation of Plaintiffs' Fourth Amendment rights.

### Count V
*Fourth Amendment*
Damage to Property and Property Interests

89) The foregoing paragraphs are incorporated herein by reference.

90) Defendants' conduct, as herein described, violated Plaintiffs' right to privacy in the sanctity of their home in violation of their Fourth Amendment rights.

91) Defendants' conduct, as described herein, caused unnecessary and unjustified damage to Plaintiffs' home and belongings in violation of Plaintiff's Fourth Amendment Rights. This damage included, inter alia:

   a) Defendants used battering rams to break the exterior doors to the home, including screen doors.
   b) Defendants broke seven windows, all of which had been recently installed.
   c) Defendants broke multiple interior doors.
   d) Defendants cracked photographs and mirrors throughout the home.

- e) Defendants broke the family's two television sets.
- f) Defendants broke the family's front porch swing and bench.
- g) Defendants ripped brand new carpet in the hall and on the stairs.
- h) Defendants put numerous holes in walls throughout the home.
- i) Defendants pulled the blinds from the windows and destroyed them.
- j) Defendants broke a chandelier and a hanging lamp.
- k) Defendants broke the family's dining room chairs.
- l) Defendants put holes in the six air mattresses on which the family slept.
- m) Defendants left burn marks on the floors and walls from detonating flash bang grenades.

92) Defendants' conduct, as described herein deprived Plaintiffs of the use and enjoyment of their home in violation of their Fourth Amendment rights.

## Count IV
*Fourth Amendment*
Concerted Activity/Failure to Intervene

93) The foregoing paragraphs are incorporated herein by reference.

94) Each Defendant acted in concert with every other defendant to commit the unconstitutional actions described herein.

95) Each Defendant failed to intervene to prevent the violation of Plaintiffs' rights as outlined herein, despite having the opportunity to do so.

**VI) DAMAGES**

96) As a direct result of the defendants' conduct as described herein, Plaintiffs have suffered severe emotional distress, embarrassment, humiliation and psychological trauma.

97) As a direct result of Defendants' conduct, as described herein, Plaintiffs have suffered damage to their property.

98) As a direct result of Defendants' conduct as hereinbefore described, Plaintiffs have suffered physical illness or injury.

WHEREFORE, Plaintiffs request judgment in their favor for compensatory and/or punitive damages and an award of costs and attorneys' fees and such other relief as this Court deems appropriate and/or equitable under the circumstances.

                Respectfully submitted,

                /s/ Margaret S. Coleman
                Margaret S. Coleman, Esq.
                PA I.D. #200975

                O'BRIEN COLEMAN & WRIGHT LLC
                116 Boulevard of the Allies
                Pittsburgh, PA  15222

                Attorney for Plaintiffs